IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:11-CV-0236-AT |
| JUSTIN MAURICE MOORE, WILLIE THACKSTON, THE ESTATE OF BRANDON THOMAS, BRANDY THOMAS, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

## ORDER

This matter comes before the Court on Plaintiff's Complaint for Declaratory Judgment [Doc. 1]. On November 12, 2009, Defendant Justin Maurice Moore killed Brandon Thomas and injured Willie Thackston with a gun while driving an employee vehicle insured by Plaintiff Travelers Property Casualty of America ("Travelers"). Travelers seeks a declaratory judgment that it has no duty to indemnify Moore for any lawsuits arising from this incident. Travelers makes two alternative claims: (1) the policy does not apply because the incident was not an accident; and (2) if the policy applied, Defendant Moore's acts trigger the "expected or intended from standpoint of insured" exclusion from

coverage.   Based on the record before the Court and for the reasons more thoroughly discussed below, the Court finds (1) the incident was an accident within the meaning of the policy, and (2) the exclusion does not apply.

## I.   PROCEDURAL HISTORY

Travelers filed its Complaint on January 25, 2011 seeking a declaration of its obligations under a commercial automobile insurance policy (the "Policy") issued to GTECH Corporation ("GTECH").   (Doc. 1.)   Travelers alleged that GTECH's policy did not cover Mr. Moore's actions on November 12, 2009. Travelers asserted that Moore was not an insured under the terms of the Policy, and even if he was, the incident was not an accident.   Finally, Travelers alleged that the policy contained an exclusion, which bars coverage in this circumstance.

The parties filed cross-motions for summary judgment.   (Docs. 42, 46.) Despite pleading three separate grounds for non-liability for the November 12, 2009 incident, Plaintiff moved for summary judgment solely on the basis that Mr. Moore was not an insured under the policy.   (Doc. 62 at 7.)   Defendant moved for summary judgment, *inter alia*, for the opposite proposition — that Moore was an insured.   The resolution of these cross-motions turned on whether Mr. Moore's use of a GTECH vehicle during the November 12, 2009 incident opened GTECH for potential vicarious liability through their automobile insurance policy.   Rhode Island law controlled the analysis because Georgia's choice-of-law precedent followed the traditional *lex loci contractus* doctrine, which provides that the law where the contract was made shall govern its

interpretation.  (Doc. 62 at 5.)  Since, under Georgia law, a contract was "made" where it was delivered and Travelers delivered the policy to GTECH in Rhode Island, Rhode Island law governed the dispute.

The Court determined that Rhode Island had created a bright line rule for assessing liability of an employer/owner for acts of employee/driver.  In Rhode Island, an employer may not limit his vicarious liability by limiting an employee's use of a company vehicle to particular purposes. *See* R.I. Gen. Laws § 31-33-6 and § 31-33-7; *see also Black v. Vaiciulis*, 934 A. 2d 216 (R.I. 2007) (finding an employer liable for employee's accident in a company car despite the employee's violation of the employer's clear direction not to use the vehicle on the weekend).

In light of such clear authority, the Court granted, in part, the Defendants' Motion for Summary Judgment, finding that Moore was an insured for the November 12, 2009 incident.  (Doc. 62 at 16.)  The Court then recognized the outstanding factual issues: whether the incident was a covered act under the policy and whether the "expected or intended from the standpoint of the insured" exclusion applied.  Accordingly, the Court directed the parties to mediate the remaining issues and, if mediation proved unsuccessful, to file a consolidated pretrial order.  (Docs. 62, 64.)

The parties were unable to settle this matter and submitted a proposed pretrial order on September 14, 2012.  (Doc. 66.)  They noted that the trial would be heard by the Court without a jury, and that two civil actions against Defendant Moore were stayed pending the resolution of this case.  (Doc. 66.)  In a pretrial

conference, the parties stipulated to submit portions of the criminal proceedings against Defendant Moore in lieu of presenting witnesses at trial. (Doc. 78.)  The parties then submitted portions of the criminal transcript, proposed findings of fact and law, briefs, and exhibits from the criminal trial. (Docs. 82-89.)

Finally, the parties clarified that the only issue before the Court at this time is Plaintiff's duty to *indemnify* the insured. In an August 21, 2013 telephone conference, Plaintiff clarified that, based on the Court's previous rulings, it concedes it has a duty to *defend* the claims asserted against Moore in the two underlying civil actions.[1]

## II.   GENERAL INTRODUCTION

The case arises from a peculiar set of facts, a seemingly made-for-television-type drama to which the Court does not soon expect anything even remotely resembling a sequel. Were the results not so tragic, humor, a trusted guide when venturing in the unfamiliar, would doubtless be in order. Death, shotgun wounds, incarceration, and liability, the case's principle subjects,

---

[1] To determine duty to defend under Rhode Island law, the court would follow the "pleadings test." Under the pleadings test, the Court considers the allegations in the underlying complaint against the insured and "if the pleadings recite facts bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff." *Progressive Cas. Ins. Co. v. Narragansett Auto Sales*, 764 A.2d 722, 724 (R.I. 2001) (applying the pleadings test and ruling that the automobile insurer had a duty to defend the tort claim against insured) (quoting *Peerless Insurance Co. v. Viegas*, 667 A.2d 785, 787 (R.I. 1995)); *accord Shelby Ins. Co. v. Ne. Structures, Inc.*, 767 A.2d 75, 76 (R.I. 2001); *Grenga v. Nat'l Sur. Corp.*, 317 A.2d 433, 435-436 (R.I. 1974) ("In this jurisdiction we adhere to the rule that the insurer's duty to defend is determined by the allegations contained in the complaint filed against the insured."); *Emhart Indus., Inc. v. Cent. Indem. Co.*, 559 F.3d 57, 66-69 (1st Cir. 2009) (affirming district court's application of Rhode Island's pleadings test in an environmental tort case with multiple insurers). As Plaintiff concedes the issue of duty to defend for purposes of this Order, the Court does not engage in the pleadings test.

however, offer no chances for levity.  Instead, to orient the reader to the unique issues of fact and law, the Court here offers condensed versions of the facts, the applicable insurance policy sections, and the parties' arguments.  All are more fully discussed in later sections, and this general introduction aims only to set the table for that later discussion.

The November 12, 2009 incident begins with Mr. Moore's displeasure that Willie Thackston and Brandon Thomas were repossessing his Ford Mustang. Mid-repossession, Mr. Moore came out of his home with a shotgun and fired four shots: one in the air, two at the back of the repossession truck where his Mustang hung, and one blowing out the truck's front tire.  Thackston and Thomas then pulled away with the Mustang in tow.  Moore gave chase in his GTECH work van.

Both parties agree that, at some point during the chase, the two vehicles collided, a fifth shot discharged, and the fifth shot caused Thomas's death and all the injuries to Mr. Thackston.[2]  The parties disagree on the particular sequence of these events.  Plaintiff, Travelers, contends that the vehicles collided and came to a complete stop before Moore pulled the trigger to discharge the fifth shot.  The import of Plaintiff's version of the facts is clear: Moore meant to pull the trigger and meant to cause harm.  The implication from Defendants' version of the facts is equally transparent.  Defendants argue that the collision entangled the barrel of the shotgun between the GTECH van and repossession truck and that the

---

[2] Before issuing this Order, the Court directed the parties to brief the latter two issues, the total number of shots fired and how the shots caused the bodily injuries, specifically. (Doc. 95.)  Both parties agreed that there were five total shots and that the fifth shot caused the death of Mr. Thomas and all of Mr. Thackston's injuries. (Docs. 96-98.)

shotgun discharged before Moore could fully regain control.  Defendants' theory thus points towards an accidental discharge associated with an automobile accident.  This contested sequence of events just before the fifth shot is the major factual issue of the case because of the language within Travelers insurance policy with GTECH.

As with the facts, the parties agree about most of the insurance coverage issues.  Neither party disputes that Moore was employed by GTECH, that GTECH had a policy with Travelers that included business automobile coverage, and that the policy was in effect for the November 12, 2009 incident.  Travelers originally argued that Moore was not an "insured" as defined by the policy, but, as explained above, that argument failed because of Rhode Island's expansive vicarious liability for automobile insurance coverage.   Travelers offers two additional theories for non-liability for the incident under the policy, both of which Defendants dispute.

First, Travelers argues that the policy does not apply because coverage only extends to "'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance of use of a covered 'auto.'"  Since Moore intended to shoot, Travelers argues, the resulting bodily injury was not an "accident" and therefore the policy does not apply. Travelers also contends, in various guises throughout its briefs and filings, that "caused" has a specific legal meaning that must apply to this insurance policy. Under this view, the foreseeable consequences of an act were caused by it.

Therefore, if it were foreseeable that driving with a shotgun could cause bodily injury, then the policy would not apply because the injuries were the foreseeable consequence of the intentional (read: non-accidental) act of driving with a shotgun. Defendants, maintaining the shotgun discharged accidently, argue the policy applies to the incident and that Travelers' "cause" argument undermines the purpose of automobile insurance coverage because it forecloses coverage for any negligent act.

Next, and alternatively, Travelers argues that even if the incident satisfies the "accident" threshold, it nonetheless should be excluded from full coverage because of an exclusion.[3] The policy states, "[t]his insurance does not apply to 'bodily injury' or 'property damage' expected or intended from the standpoint of the 'insured.'" Travelers believes Moore's actions fit into the exclusion because he fired intentionally into the cab of the repossession truck with the intent to injure Thomas and Thackston. Defendants again counter that the shotgun discharged accidently and consequently the exclusion does not apply.

These three issues, the factual dispute of the sequence of events and the two contested insurance policy sections, form the bulk of the opinion below. Travelers offers one additional argument, however, that too should be introduced. Following the incident, Mr. Moore was arrested and charged with several crimes. After a full trial, a jury found him guilty of aggravated assault and felony murder. The jury found him not guilty of murder, voluntary

---

[3] The "expected or intended from the standpoint of the insured" exclusion, if applicable, caps liability at $25,000/$50,000. (*See infra*, Findings of Fact ("FOF") no. 6.)

manslaughter, and involuntary manslaughter.  Travelers argues that the criminal trial resolves the issues before the Court.  Since aggravated assault requires intent and such intention cannot be accidental, Travelers insists, the insurance policy cannot apply.  Defendants argue that Moore's pending appeal prevents any estoppel argument and, even if this were not so, that Moore's criminal intent does not track the insurance policy language and therefore would be of no use in this matter.

This case presents a novel set of facts and rests mainly on Rhode Island's distinctive insurance law principles.  This Court presumes that Rhode Island laws reflect the measured judgment of the populace and that the state courts' precedent clarifies any ambiguity when applying that judgment.  Thus, unless and until a wholly novel question arises, this Court does not rule based on laws and precedent from neighboring jurisdictions.  Finally, this Court does not sit as a super legislature and is ill-positioned to make a normative policy decision of whether insurance should cover such incidents.  Instead, the Court simply applies Rhode Island law to determine whether the GTECH policy applies to the November 12, 2009 incident.

## III.   FINDINGS OF FACT

The parties stipulate to a number of facts to narrow the scope of this case.[4] (Doc. 74, Stipulation of Facts to be Used at Trial, hereafter "Stip.")  The parties, to

---

[4] The Court includes all the stipulations in its Findings.  Occasionally, the Court needed to add, modify, or delete phrases for coherence and ease of reading.  These modifications do not displace or disturb the essence of the parties' understanding as expressed in the stipulations.

facilitate the Court's factfinding, submitted amended proposed findings, with supporting and reply briefs.  (Docs. 82, 84, 85, 88, 89.)   The parties also submitted portions of the trial transcript and selected exhibits from *State of Georgia v. Justin Moore.*   (Docs. 83, 86, 87.)   The Court reviewed these documents, and all filings, with an eye towards resolving the outstanding factual disputes regarding the application of the policy's "accident" trigger and "expected or intended from the standpoint of the insured" exclusion.   To resolve these issues, the Court finds the following facts.

<u>**GTECH and The Travelers Policy**</u>

1.      At the time of the incident, Moore was employed by GTECH as a field-services technician.  (Stip. No. 33.)

2.      GTECH is the named insured under Policy No. TC2JCAP-101D6235, issued by Travelers, effective 10/01/09 to 10/01/10 ("the Travelers Policy").  (Stip. No. 34.)

3.      The Travelers Policy includes commercial automobile coverage, as set forth in the Business Auto Coverage Form, Form No. CA TO 31 11 07.  (Stip. No. 35.)

4.      Section 2 of the Travelers policy sets forth the applicable liability coverage.  It provides, in pertinent part, as follows:

> A. Coverage
>
> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the

ownership, maintenance of use of a covered "auto."

(Stip. No. 36.)

5.     The Travelers Policy also includes certain exclusions.  As amended by the Georgia Changes endorsement, Form CA 01 09 10 04, the policy excludes coverage for an "expected or intended" injury:

> This insurance does not apply to "bodily injury" or "property damage" expected or intended from the standpoint of the "insured". However, this exclusion does not apply for coverage up to the minimum limit specified by the Georgia Motor Vehicle Safety Responsibility Act.

(Stip. No. 37.)

6.     The applicable minimum limit specified by the Georgia Motor Vehicle Safety Responsibility is $25,000/$50,000.  (Stip. No. 38.)

## The Initial Dispute

7.     On November 12, 2009, Willie Thackston and Brandon Thomas went to the home of Justin Moore to repossess Moore's personal vehicle, a Ford Mustang.  (Stip. No. 1.)

8.     The Ford Mustang was parked in Moore's driveway ahead of a Ford Econoline van, which was owned by Moore's employer, GTECH corporation. (Stip. No. 2.)

9.     Upon arriving at Moore's residence, Thomas went to the front door and rang the doorbell.  (Stip. No. 3.)

10.    Thomas had a conversation with one of the residents of Moore's home.  (Stip. No. 4.)

11.     After the conversation, Thackston and Thomas proceeded to attach the Mustang to their tow truck.  (Stip. No. 5.)

12.     As Thackston and Thomas were attaching the tow truck, Moore came out of his house holding a loaded sawed-off shotgun.  (Stip. No. 6.)

### **The Shotgun**

13.     The shotgun was fully loaded with six cartridges.  (Trial Tr. (Justin Moore) 858:12-17; Trial Tr. (Georgia Bureau of Investigations Firearms Examiner, Kyle Felix) 468:6-11).)

14.     Each shotgun cartridge contains nine pellets.  (Trial Tr. (Felix) 475:1-2 (providing uncontroverted testimony that the shotgun cartridge case indicated each cartridge contained nine pellets; Trial Tr. (Fulton County Deputy Chief Medical Examiner, Michele Stauffenberg) 439:9-13 (addressing the admitted evidence of shotgun cartridge with nine pellets).)

15.     The cartridge also contains gunpowder, wadding, and other packing materials.  (Trial Tr. (Felix)  476-477 and 480:10-11); (Trial Tr. (Stauffenberg) 419:15-17 and 421:4-5 (defining "stippling" as the fine particles that eject with the pellets; Trial Tr. (Stauffenberg) 426:2-6 (describing two "very light" cardboard disks within cartridge).)

16.     The shotgun must be pumped, or "racked," before each shot.  (Trial Tr. (Felix) 472:14-17.)

17.     The shotgun trigger requires 4 ¾ pounds of pressure to fire.  (Trial. Tr. (Felix) 478:12.)

18.    Once fired, the pellets spread apart as they travel through the air. (Trial Tr. (Stauffenberg) 421:24-25); (Trial Tr. (Felix) 473:15).)

19.    An intermediate object, one that pellets strike but continue through, expedites the spread of the pellets.  (Trial Tr. (Stauffenberg) 422:1-4 and 422:23-25.)

20.    The wadding and other material shoot out of the barrel with the pellets.  The other materials come out as fast as the pellets but quickly lose velocity.  (Trial Tr. (Stauffenberg) 419:7-11.)

21.    The shotgun did not have an accidental discharge problem.  (Trial Tr. (Felix) 472-484 (stating and reiterating that the gun would not fire without a trigger pull and that the subsequent tests of the shotgun indicated the gun did not have accidental discharge problems).)

## The First Four Shots

22.    Once outside his home, Moore fired a "warning shot" into the air. (Stip. No. 7.)

23.    Moore then fired two shots aimed at and striking the boom of the tow truck.  (Stip. No. 8.)

24.    Then, Moore ran around to the front of the truck and fired a shot at the front, passenger-side tire.  (Stip. No. 9.)

25.    The shot struck the tire, causing the tire to go flat.  (Stip. No. 10.)

## The Chase

26.    Despite the flat tire, Thackston drove the tow truck away from

Moore's house, with Thomas in the passenger seat, and with the Mustang still in tow.  (Stip. No. 11.)

27.     Moore then went back into his house and retrieved the keys to the GTECH van.  (Stip. No. 12.)

28.     Bringing the shotgun with him, Moore chased after Thackston and Thomas in the van.  (Stip. No. 13.)

29.     Thackston saw Moore driving up the street in the rearview mirror of the tow truck.  (Stip. No. 14.)

30.     Thackston assumed that Moore intended to fire the shotgun at the truck again, so he caused the truck to swerve back and forth across the road to prevent Moore from getting a good shot and/or pulling up alongside of the truck. (Stip. No. 15.)

31.     As the tow truck entered a cul-de-sac, Moore drove the van up next to the passenger side of the truck.  (Stip. No. 16.)

32.     The vehicles were traveling around 25-35 miles per hour.  (Trial Tr. (Thackston) 133:8-9.)

33.     The F-450 tow truck, with a boom and Mustang attached, weighed more than GTECH's van.  (Trial Tr. (expert witness in structural collision repair, Richard Everett) 510-11.)

34.     Mr. Moore held the steering wheel with his left hand and held the shotgun with his right hand.  The shotgun barrel rested on the windowsill.  (Trial Tr. (Willie Thackston) 97:6-17); (Trial Tr. (Moore) 862-3.)

35.     Mr. Thomas, sitting in the passenger seat of the truck, held the handle next to the window.  (Trial Tr. (Thackston) 113:4-8.)

36.     There was a collision between the passenger side of the truck and the driver side of the van.  (Stip. No. 17.)

37.     The collision caused damage to both vehicles. (Doc. 86-1, State Exhs. 30 and 31) (depicting scrapes to F-450 passenger side, which is roughly the same height as van's external step); (Trial Tr. (Officer John Taylor) 211-212 (describing damage to van's driver side and front flat tire) and (Doc. 86-1, State Exhs. 67-70 (showing the same); (Trial Tr. (Thackston) 108-109 and 150:15-25 (noting damage to truck's bumper and simulator, a technical term for what lay people call hubcap).)

### The Collision and the 5th shot

38.     After the collision, when police arrived on the scene, the truck was in the middle of the street. (Doc. 86-1, State Exh. 27.)

39.     The truck's passenger side window was shattered and the passenger side mirror was bent inside the door and completely shattered.  (Doc. 86-1, State Exh. 18.)

40.     Glass was on the ground several feet behind the truck's passenger side tire.  (Doc. 86-1, State Exhs. 18, 27, 42, and 43.)

41.     The truck's passenger side mirror had a piece missing on its face and scrapes along the plastic exterior.  (Doc. 86-2, State Exhs. 89-90.)

42.     At some point after the collision (Stip. No. 18.), but before the

vehicles came to a complete stop, Moore's shotgun discharged.

Plaintiff relies on Thackston's testimony to establish that both vehicles came to a complete stop before the fifth shot.  (Doc. 84, ¶ 26 (citing Thackston's testimony in the criminal trial).)  Other evidence contradicts the complete stop theory.  Richard Everett, a structural collision repair expert who testified at the criminal trial, came to a different conclusion.  Mr.  Everett's theory was that the truck hit the van, which forced the truck's passenger side mirror rearward and the van, which is much lighter than the truck, to rock briefly.  The shotgun, in this process, according to Everett, got entangled in the housing of the truck's passenger side mirror.  (Trial Tr. (Everett) 519-525.)  As the van rebounded from the collision impact, Everett continued, the shotgun slipped from Mr. Moore's grasp and when he tried to grab it, he accidently fired it into the truck's cab.  Everett concluded: "It goes off. It plows a plug out of the mirror, a section out of the victim's arm, and you have a spray on his chest.  If he's sitting in that van, you've got your angle."  (Trial Tr. (Everett) 527:10-13.)

Many facts in the record corroborate Everett's theory.  The volume of glass behind the truck's rear tires matches Everett's idea that the shot happened before the car came to a stop.  (*See* Findings of Fact ("FOF"), *supra*, no. 40.)  Thackston testified that the pellets hit the tow truck passenger-side window before striking Thomas.  (Trial Tr. (Thackston) 100:22-23.)  By contrast, if the shotgun discharged after both vehicles stopped and struck a window first, then either the glass would have fallen on the ground by the passenger door or the truck would

have had to move before the police arrived.  Nothing in the record, however, indicates that either happened.  As a result, the position of the glass, several feet behind the truck's rear passenger side tire that no one testified moved after the collision, contradicts Thackston's recollection of the collision.[5]

The damage to the vehicles also corresponds with Everett's description. (FoF no. 37.)  The truck's passenger side mirror, located between the shotgun's barrel and Thomas's wrist, is an important piece of the story that Travelers does not address.  Travelers offers no explanation for how the passenger side mirror bent into the truck without breaking the window.  (*See* FoF no. 39.)  Nor does Travelers explain the missing piece of the passenger side mirror.  (FoF no. 41; (Doc. 86-2, State Exhs. 89-90.)  Although not dispositive, Mr. Everett's theory of the accident, uncontested on vital particulars, carries more weight in light of Traveler's silence on the logistics of the accident.  Accordingly, the Court finds that the vehicles did not come to a complete stop before the fifth, and final, discharge.

43.    Mr. Moore's finger was on the trigger at the time of the fifth, and final, discharge.  (Trial Tr.  (Felix) 472:22-4 (asserting the shotgun would not discharge without a finger on the trigger); Trial. Tr. (Moore) 864-5 (admitting

---

[5] As the Court is well aware, misperceiving or misremembering a jarring event is quite common and in no way reflects upon Mr. Thackston's candor or truthfulness at the criminal trial.  Since Travelers relied exclusively on Thackston's testimony, however, and certain portions of the testimony conflict with the physical evidence, Travelers' theory of the collision necessarily proved less plausible than competing theories that incorporated such physical evidence.

that his finger may have been on the trigger but could not be sure if it was or not).)

44.    The shotgun blast struck both Thomas and Thackston.   (Stip. No. 19.)

45.    Thomas was killed and Thackston was injured.  (Stip. No. 20.)

46.    The fifth shot caused Thomas's death and all Thackston's injuries. Mr. Thomas had a large shotgun wound on his right wrist.  (Docs. 96-98.);(Doc. 86-1, State Exh. 32); (Trial Tr. (Stauffenberg) 420:11-16.)

47.    Mr. Thomas was shot at close range.  (Trial Tr. (Stauffenberg) 424-427) (explaining that the circular abrasions on Thomas's chest were likely caused by shotgun wadding at close range).)

## The Post-Shooting Events

48.    Moore drove off and as he did so, the van rocked the truck because the two vehicles were stuck together.  (Trial Tr. (Thackston) 86:21-23.)

49.    Moore returned to the tow truck moments later and pointed the shotgun at Thackston.  He demanded that Thackston lower the Mustang from the boom.  (Stip. No. 21.)

50.    Thackston told Moore that if Moore got into the Mustang, he would lower it.  So Moore got into the Mustang, and Thackston lowered it to the street. (Stip. No. 22.)

51.    After lowering the Mustang, Thackston ran away from the truck and into the nearby woods.  (Stip. No. 23.)

52.   Once the Mustang was lowered, Moore began to drive away.   (Stip. No. 24.)

## The Criminal Trial and Appeal

53.   On February 5, 2010, Moore was indicted and charged with several crimes, including felony murder and two counts of aggravated assault with a deadly weapon.  (Stip. No. 25.)

54.   The indictment for felony murder read: "[T]he Grand Juror aforesaid, in the name and behalf of the citizens of Georgia, do charge and accuse Justin Moore with the offense of Felony Murder § 16-5-1, for the said accused, in the County of Fulton and State of Georgia, on the 12th day of November, 2009, did unlawfully during the commission of a felony, to wit: Aggravated Assault, caused the death of Brandon Thomas, a human being, by shooting him with a shotgun . . . ." (Stip. No. 26.)

55.   The indictment for the first aggravated-assault charge read: "[T]he Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia, do charge and accuse Justin Moore with the offense of Aggravated Assault With A Deadly Weapon O.C.G.A. § 16-5-21, for the said accused, in the County of Fulton and State of Georgia, on the 12th day of November, 2009, did unlawfully commit an assault upon the person of Brandon Thomas, by shooting him with a shotgun, a deadly weapon . . . ."  (Stip. No. 27.)

56.   The indictment for the second aggravated-assault charge read: "[T]he Grand Jurors aforesaid, in the name and behalf of the citizens of Georgia,

do charge and accuse Justin Moore with the offense of Aggravated Assault With A Deadly Weapon O.C.G.A. § 16-5-21, for the said accused, in the County of Fulton and State of Georgia, on the 12th day of November, 2009, did unlawfully commit an assault upon the person of Willie Thackston, by shooting him with a shotgun, a deadly weapon . . . ."  (Stip. No. 28.)

57.     On December 6, 2010, after a full jury trial, Moore was convicted of felony murder and both counts of aggravated assault with a deadly weapon. (Doc. 77, Additional Stipulation, 1.)

58.     Moore was also indicted and charged with the crime of murder for unlawfully and with malice aforethought causing the death of Brandon Thomas by shooting him with a shotgun.  The jury returned a verdict of "not guilty" with respect to this charge.   Moore was also found not guilty of voluntary manslaughter and involuntary manslaughter.  (Stip. No. 29; Doc. 83-4 at 1016-1021.)

59.     Mr. Moore filed an appeal of his criminal conviction.  (Doc. 94.)  As of the date of this Order, the appeal remains pending.  *See* Computerized Docket and Case Types, Georgia Supreme Court, http://www.gasupreme.us/ (follow "docket" hyperlink; then "Search the docket" for "S13A1366"; then follow "S13A1366" hyperlink) (last visited August 16, 2009).

## **The Underlying Tort Claims**

60.     Willie Thackston and Allison Thackston have filed suit against Justin Moore for liability arising out of the November 12, 2009 incident.  (Stip. No. 30.)

61.     Brandy Thomas and the Estate of Brandon Thomas have also filed suit against Justin Moore for liability arising out of the November 12, 2009 incident.  (Stip. No. 31.)

62.     The Thackstons, Brandy Thomas, and the Thomas Estate, through their counsel, contend that the Travelers Policy provides coverage to Moore for the claims asserted in their tort complaints.  (Stip. No. 32.)

## IV.    CONCLUSIONS OF LAW

### A.    *Collateral Estoppel*

1.     Collateral estoppel, or issue preclusion, prevents relitigation of issues necessarily decided in a previous action by a court of competent jurisdiction.  *San Remo Hotel, L.P. v.  City & Cnty. of San Francisco*, 545 U.S. 323, 336 (2005).

2.     Federal courts sitting in diversity apply the preclusion law of the State in which judgment was rendered.  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).

3.     Mr. Moore's criminal trial was in Georgia and thus Georgia's law of preclusion applies.  (FoF nos. 53-58.)

4.     In *Strong*, the Eleventh Circuit synthesized Georgia collateral estoppel cases and announced a seven-part test: "A party seeking to assert collateral estoppel under Georgia law must demonstrate that (1) an identical issue, (2) between identical parties, (3) was actually litigated and (4) necessarily

decided, (5) on the merits, (6) in a final judgment, (7) by a court of competent jurisdiction." *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1264 (11th Cir. 2011).

5.       Mr. Moore's appealed his criminal convictions, which suspends judgment.  (FoF no. 59.)  *See* O.C.G.A. § 9-12-19; *Greene v. Transp. Ins. Co.*, 313 S.E.2d 761, 763 (Ga. Ct. App. 1984) ("In Georgia a judgment is suspended when an appeal is entered within the time allowed." (internal citations omitted)).

6.       The suspended judgment undermines the sixth element (finality) of Georgia collateral estoppel requirements.  This Court, consequently, may not estop Defendants from arguing the merits of the case.

7.       Even without the appeal, however, the jury's verdict would not resolve this case.  The convictions do not align with the factual issues of this case. Travelers argument to the contrary fails because it relies on a false equivalency between an element of a criminal charge and particular language of the insurance policy.

"The rule supported by the great weight of authority is to the effect that a judgment of conviction or acquittal rendered in a criminal prosecution cannot be given in evidence in a purely civil action, to establish the truth of the facts on which it was rendered." *Cobb v. Garner*, 279 S.E.2d 280, 282 (Ga. Ct. App. 1981).  Insurance law, coincidentally, best exemplifies the rule. In *Parker*, the Georgia Court of Appeals rejected the insurance company's argument that an assault conviction necessarily triggered the intentional act exclusion of an insurance policy. *Continental Cas. Co. v. Parker*, 288 S.E.2d 776, 779 (Ga. Ct.

App. 1982).  The result does not change with a conviction for aggravated assault. *See Anderson v. S. Guar. Ins. Co. of Ga.*, 508 S.E.2d 726, 728 (Ga. Ct. App. 1998) (finding a duty to defend despite convictions for aggravated assault, simple battery and seven counts of reckless endangerment).  The instant case follows *Parker* and *Anderson*.

In both cases, the insurance company sought a judgment that it had no duty to defend because a criminal conviction fit within the "expected or intended from the standpoint of insured" exclusion from coverage.  In both *Parker* and *Anderson*, the criminal defendant maintained that the victim's bodily injuries were not intentional.  This case is no different.  Mr. Moore was convicted of aggravated assault yet maintains he did not intend to injure Thomas and Thackston.  The Court follows Georgia precedent: Moore's criminal conviction does not automatically relieve Travelers of its duties under the policy.

The Court also notes the peculiar asymmetry of the jury's verdict in Mr. Moore's criminal trial, which independently forecloses any argument that the criminal trial resolves the issue of intent before this Court.  The jury convicted Moore of felony murder, which means they found that Moore caused the death of a human being, with or without malice, in the commission of the felony of aggravated assault.  (FoF no. 57; Doc. 83-4 at 1018.)  The court defined aggravated assault as the attempt to commit violent injury with a deadly weapon. (Doc. 83-4 at 1021.)  Yet, Moore was not found guilty of murder (causing death with malice aforethought), voluntary manslaughter (causing death out of a

sudden, violent, irresistible passion in response to a serious provocation), or involuntary manslaughter (causing death unintentionally either by reckless conduct or by pointing a firearm at another).  (FoF no. 58; Doc. 83-4 at 1016-1021.)

The jury's findings appear contradictory regarding Moore's intent. Combining their separate findings illustrates the confusion.  While attempting to injure someone with a weapon, Moore caused Brandon Thomas's death, but did not do so intentionally, rashly, recklessly, or while pointing a gun at him.  The jury's findings do not clarify, for example, how Moore could kill Thomas (who died from shotgun wounds), while purportedly attempting to injure him but not while pointing a gun at him.  Moore's intent and, as a result, the accident question are unresolved by such a discordant result.

Criminal negligence further muddies the water.  At the criminal trial, the jury could convict with a "criminal negligence" mens rea.  The instructions defined criminal negligence as "an act which demonstrates a willful, wanton, or reckless disregard for safety of others who might reasonably be expected to be injured thereby."  (Doc. 83-4 at 1016.)  Since the jury could convict for reckless conduct, Moore's conviction does not preclude the possibility that the conduct was both criminally culpable and nonetheless an unintentional — or an "accident" within the meaning of the insurance policy.  *See*, *infra*, Section IVB (applying Rhode Island law and finding that Travelers insurance policy language does not exclude negligent and reckless acts).

In sum, Mr. Moore's criminal convictions do not resolve the issues before this Court.   Even if the convictions were not suspended by appeal, the Court would not grant Travelers request for collateral estoppel on either the accident question or the application of the "intended or expected from the standpoint of the insured" exclusion.   Georgia law, which governs our preclusion analysis, does not allow a criminal conviction to establish "the truth of the facts on which it was rendered" in a subsequent civil case.   This general prohibition is especially warranted here where the jury's verdict confuses more than clarifies.   Since Travelers preclusion arguments fails, the Court now turns to the merits.

### B.   *Rhode Island Insurance Law*[6]

8.    Rhode Island uses a burden shifting approach to insurance coverage. *Children's Friend & Serv. v. St. Paul Fire & Marine Ins. Co.*, 893 A.2d 222, 230 (R.I. 2006).

9.    A person seeking coverage has a prima facie burden to show that (1) the policy applies to the incident at issue.   *Id.*   The burden then shifts to the insurer to prove (2) an exclusion or limitation applies by a preponderance of the evidence.   *Id.*

### 1. The policy's "accident" trigger

10.    The Court finds that the November 12, 2009 incident qualifies as a covered accident as defined by the GTech policy.   Under the terms of the policy an "'[a]ccident' includes continuous or repeated exposure to the same conditions

---

[6]  The Court has already determined that Rhode Island law applies to the dispute regarding the Travelers policy.  (Doc. 62 at 16.)

resulting in 'bodily injury' or 'property damage.'"  (Pl. First Am. Compl., Ex. C.)
The Court views this definition through two Rhode Island legal lenses.

First, under Rhode Island insurance principles, ambiguous contract
provisions are construed against the insurer.  *See Lynch v. Spirit Rent-A-Car,
Inc.*, 965 A.2d 417, 425 (R.I. 2009).  The definition of "accident" under the policy
allows for multiple interpretations and is thus ambiguous.  *See Bliss Mine. Rd.
Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.*, 11 A.3d 1078, 1084 (R.I. 2010).
For example, Plaintiff reasonably argues that accident must mean a non-
intentional act.  (Pl. Resp. Defs. Am. Proposed Findings, Doc. 88, at 4-5 ("[T]he
definitions [of accident] have one construction in common: they all define
'accident' as an act or event that is not intentional.").)  Defendants, in turn, do not
necessarily disagree but raise the issue of perspective by citing a string of Rhode
Island cases which interpreted the term "accident" under a number of Rhode
Island statutes dealing with automobiles.  (Defs. Am. Proposed Findings, Doc.
82, at 13-14 (citing *Liberty Mutual Ins. Co. v. Tavarez*, 754 A.2d 778 (R.I. 2000);
*Dias v. Cinquegrana*, 727 A.2d 198 (R.I. 1999); *Gen. Accident Ins. Co. v. Olivier*,
574 A.2d 1240 (R.I. 1990); *State v. Smyth*, 397 A.2d 497 (R.I. 1979)).)  Rhode
Island courts interpret "accident" under those statutes from a victim's
perspective.  Thus, Defendants argue, GTech's policy, which also deals with
automobiles, should do the same.  Since the term "accident", as defined in the
policy, is susceptible to more than one meaning, it is ambiguous.  Accordingly,
the Court begins with the principle that it should construe the term "accident"

liberally towards coverage.  *See Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc.*, 860 A.2d 1210, 1219 (R.I. 2004) (construing contradictory policy terms, "occurrence" and "bodily injury," towards coverage and finding that the policy included liability coverage for intentional acts of its employees).

Second, under Rhode Island law, the Court must analyze how a lay purchaser would read the entire contract.  *See Bartlett v. Amica Mut. Ins. Co.*, 593 A.2d 45, 47-48 (R.I. 1991) ("The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense."  (internal citations omitted)).  Through these two lenses, the Court turns to the parties' arguments.

Plaintiff advocates for the Court to borrow from Rhode Island's tort causation jurisprudence and find that, if Moore's intentional (non-accidental) acts were the proximate cause of the injuries, then the incident was not an accident under the policy.  (Pl. Br. Supp. Proposed Findings, Doc. 85, at 17; Pl. Additional Proposed Findings and Supp. Br., Doc. 98, at 4.)  As an initial matter, the Court notes that "legal cause" is unfamiliar to non-lawyers, and thus the "average man" is unlikely to apply legal cause to his understanding of the term "accident."  In any case, the Court rejects Plaintiff's reasoning.

Likening the insurance policy to tort law, Plaintiff argues that the policy's "cause" must mean "legal cause."  (Pl. Br. Supp. Proposed Findings, Doc. 85, at 17, (defining cause as the foreseeable consequences of one's act).)  The approach skips over the immediate causes and focuses on preceding, undeniably

intentional, acts.   (Pl. Br. Proposed Findings, Doc. 85, at 16 (contending, indisputably, that Moore chased after Thackston in his van, drove with sawed off shotgun in one hand, noticed Thackston swerving, and nonetheless drove up beside Thackston).)  If these intentional acts "caused" the injury, Plaintiff insists, then surely Travelers cannot be held liable.  (Pl. Br. Supp. Proposed Findings, Doc. 85, at 17-19, (citing *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008)).)

Travelers premises its argument on a public nuisance case.  In *Lead Indus. Ass'n*, the Rhode Island Supreme Court explained the relationship between a public nuisance and torts.   "Causation is a basic requirement in any public nuisance action; such a requirement is consistent with the law of torts generally." *Lead Indus. Ass'n.*, 951 A.2d at 450.

Unlike the law of public nuisance, however, insurance law is not always consistent with the law of torts because liability insurance stands to insulate people and companies *from* torts.   Couch on Insurance 3d § 139:15 (2012) (explaining that "reasonable foreseeability," a tort concept, is ill equipped for insurance disputes because people buy insurance to guard against negligent acts). Put differently, Plaintiff's approach ensnares negligent conduct and, thereby, stands to eviscerate insurance protection from third party liability.   Although similar, tort law's proximate cause does not apply jot for jot to insurance coverage.  Rather insurance coverage depends on the "*nature* of bodily injuries and *how* the alleged tortfeasor supposedly inflicted those injuries."   *Am.*

*Commerce Ins. Co. v. Porto*, 811 A.2d 1185, 1195 (R.I. 2002) (emphasis added). The language within the policy, rather than concern of "culpability or why the injury occurred," governs. *Id.* Insurance law may borrow from tort law, but in a more precise way than Plaintiff argues. *See* Couch on Insurance 3d § 101:40 (2012) ("[I]nsurance law employs concept of proximate cause for purposes of determining whether the *specific type of injury* caused by the *specific type of physical act or event* was intended to be covered under *the terms of the policy*" (emphasis added)). Consequently, depending on the language of the contract, an insurance policy may require coverage for damage stemming from an insured's intentional, and even criminally culpable, act.

Plaintiff resists such a conclusion and points to persuasive authority from the Eleventh Circuit. (Pl. Additional Proposed Findings and Supp. Br., Doc. 98, at 4.) An Eleventh Circuit Court of Appeals case and a Georgia Court of Appeals case both found that the "intentional act" exclusion applied to injuries resulting from reckless handling of firearms. (*Id.*, citing *Allstate Prop. & Cas. Ins. Co. v. Haslup*, 502 F. App'x 845 (11th Cir. 2012) and *Tripp v. Allstate Ins. Co.,* 584 S.E.2d 692 (Ga. Ct. App. 2003).) These cases offer no guidance because they answered a different question, with different policy language, in a different jurisdiction.

First, both cases address an exclusion from coverage, not, as here, whether the policy applies in the first instance. *Haslup*, 502 F. App'x at 846 ("Allstate contends that the Policy's intentional acts exclusion applies and relieves it from

providing coverage. The Haslups argue that Jonathan killed Stephanie accidently and that the intentional acts exclusion does not apply."); *Tripp*, 584 S.E.2d at 694 (reviewing lower court's ruling on the exclusion).   The courts, then, were addressing a different question than the one for which Travelers proposes an answer.   Neither case included the triggering language for the respective insurance policy.

Worse for Travelers, however, is the policy language that is included in these opinions.   In both cases, the courts construed an exclusion with an explicitly objective standard.   *Haslup*, 502 F. App'x. at 846 (excluding injury or damage "which *may reasonably be expected* to result from the intentional act or acts or omissions of, any insured person, which are crimes pursuant to the Georgia criminal code.") (emphasis added); *Tripp*, 584 S.E.2d at 694 (construing same language).   The courts determined that the exclusion would apply if "(1) the insured acted *either* intentionally *or* criminally, and (2) the resulting injuries were *either* intended *or* may reasonably be expected to result from insured's intentional or criminal acts." *Tripp*, 584 S.E.2d at 695; *Haslup*, 502 F. App'x. at 848, n.3 (emphasis in original).

The policy language addressed in *Haslup*, and that courts' analyses, do not inform this Court's decision.[7]   The reasonable person standard, "may reasonably

---

[7] Georgia law, more generally, does not appear to help Travelers case.   Georgia courts, when considering an exclusion similar to the one in this case, do not follow the reasonable person standard.   *See S. Guar. Ins. Co. of Georgia v. Saxon*, 379 S.E.2d 577, 578 (Ga. Ct. App. 1989) (finding the "expected or intended from the standpoint of the insured" exclusion did not apply

be expected," appears nowhere in Travelers' policy with GTECH. Travelers acknowledges as much and relies on the cases to reproduce its earlier point: "if one behaves recklessly with a loaded gun . . . any injuries that result from that conduct are foreseeable and thus not accidental." (Pl. Additional Proposed Findings of Fact and Supp. Br. at 5.) Again, this argument confuses tort liability with contractual interpretation. Travelers paid little heed to the differing policy provisions between the Georgia cases and its policy with GTECH. As a result, its argument carries little force.

Moreover, Travelers proposed meaning of "accident" leads to an absurd result and thus must be rejected. *Cf. Town of Cumberland v. Rhode Island Interlocal Risk Mgmt. Trust, Inc.*, 860 A.2d 1210, 1216; n.12 (R.I. 2004) (rejecting insurance company's restrictive reading of the insurance contract because it produced the "absurd result" of a contract that provided coverage for intentional torts but premised such coverage on the insured's showing that the acts were unexpected and unintended); *see also Empire Fire and Marine Ins. Cos. v. Citizens Ins. Co. of America/Hanover Ins.*, 43 A.3d 56, 61 (R.I. 2012) (applying Rhode Island's maxim that insurance contracts will not be read to render coverage illusory). Traveler's theory would exclude from coverage all foreseeable consequences of its employee's intentional acts. As Defendants point out, such an approach would enable the insurance company to avoid liability for clear-cut accidents like an employee causing an accident by intentionally

to a man who wrecked his car while fleeing from the police). Thus, Travelers invitation to use Georgia law as persuasive authority may work against its broader argument.

reaching down to retrieve a fallen cup of coffee while driving.   (Defs. Am. Proposed Findings, Doc. 82., at 14.)   Under Plaintiff's theory, since an accident is foreseeable from the driver intentionally taking his hand off the wheel and eyes off the road, even if only momentarily, the insurance company would have no duty to defend or indemnify based on injuries that result.   As the example illustrates, this approach eviscerates liability insurance because the insurance company could deny coverage any time an insured is found liable for an accident. The result is absurd because it would render GTECH's liability coverage illusory.

Likewise, Traveler's argument renders another provision of the contract meaningless and thus must be rejected.  *See Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 239 (R.I. 2004) ("[A]n interpretation that reduces certain words to the status of surplusage should be rejected.").   The "expected or intended from the standpoint of the insured" exclusion, discussed below, only has meaning if certain intentional acts were initially covered under the general provisions of the policy.   But by Traveler's definition, no intentional act would ever result in an accident, and thus there would be no need for an intentional acts exclusion.   The Court must therefore reject Traveler's proposal.

Instead, the Court adopts Defendants' proposal that an accident, as defined in the Policy, must be viewed from the perspective of the injured party.   The parties did not direct the Court to, and the Court was unable to find, any Rhode Island authority directly addressing the meaning of accident in an insurance contract context.   However, according to Couch on Insurance, "[t]he word

'accident' implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune. Accordingly, some courts have stated that harm is 'caused by accident' where it is brought about by an event which is *unforeseeable and unexpected by the person who sustained the loss.*" Couch on Insurance 3d § 126:26 (2012) (emphasis added) (compiling cases and recognizing the use of victim's perspective). Thus, many jurisdictions look to the victims to determine whether the incident was accident.

The Court finds that Rhode Island would likely fall in line with these jurisdictions. First, this reading of the policy favors coverage and is thus consistent with the cannon of construction requiring such a reading when a term is ambiguous. *See Town of Cumberland*, 860 A. 2d at 1219. Second, the Court has previously recognized Rhode Island's expansive vicarious liability for automobile owners. (*See* Doc. 62 at 13-16.) Given this expansive liability, a lay purchaser of an insurance policy would likely assume coverage for their employee's acts, even if intentional, and thus this interpretation is favored. *See Bartlett*, 593 A.2d at 47-48 ("The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense." (internal citations omitted)).

Finally, this liberal reading of the term "accident" is consistent with Rhode Island public policy. For example, in *Dias*, the Rhode Island Supreme Court, noting it "must make an interpretation grounded in policy considerations," found that accident in Rhode Island's vicarious automobile liability statute included

32

intentional acts. *Dias*, 727 A.2d at 200. The court explained that its definition helped further the statute's policy, "to protect innocent victims from having to shoulder the expense of the injury." *Id.* Vicarious liability, either statutorily as in *Dias* or under the common law, aims to increase the means of redress. The court in *Dias*, recognizing as much, defined accident from the victim's perspective. Rather than focusing on the tortfeasor, who hit the victim intentionally with a motorcycle, the court looked at the victim, for whom the incident was "a most unexpected and unfortunate accident." *Id.* Doubtless the same is true for the victims in this case and this Court, like the *Dias* Court, faces a question of vicarious liability. Accordingly, the *Dias* holding, that accident may cover intentional torts because the victim perspective governs, informs this Court of Rhode Island's policy preferences.

*Dias* ends with a caveat, that its holding "does not delineate what is or what is not covered under any particular insurance policy." *Id.* Indeed, an individual insurance policy may provide its own definition of the term "accident" and, if clear, may foreclose the definition the Court applies today. However, the policy before the Court here fails to limit the definition of the term "accident" in any meaningful way. *Dias* is one of a precious few cases to construe the term accident in a comparable, though not identical, setting, and thus informs this Court's understanding of Rhode Island's general policy preference of generous vicarious liability. Consistent with this policy, and the Rhode Island cannons of insurance policy construction, the Court finds that the November 12, 2009 incident

qualifies as an accident under the GTech policy.  Since the Defendants meet their prima facie burden to show that the policy applies, the burden next shifts to Travelers to establish the "intended or expected from the standpoint of the insured" exclusion applies.

### 2. The "intended or expected from standpoint of the insured" exclusion does not apply.

11.    The policy excludes coverage for damages "expected or intended from the standpoint of the insured." (FoF no. 5.)

12.    For the "intended or expected from the standpoint of the insured" exclusion to apply, the insured must have acted intentionally to harm.  *Angelone v. Union Mut. Ins. Co. of Providence*, 319 A.2d 344, 346 (R.I. 1974); *see also Grenga v. Nat'l Sur. Corp.*, 317 A.2d 433, 436 (R.I. 1974).  In *Grenga*, the Rhode Island Supreme Court interpreted an insurance policy provision that excluded from coverage "any injury or damage that was 'caused intentionally by or at the direction of the Insured.'" *Grenga*, 317 A.2d at 436.  The Court explained that, to trigger this exclusion, "it is the harm itself which must be intended." *Id.* at 436.  In *Angelone*, the Rhode Island Supreme Court applied this reasoning to a insurance policy exclusion nearly identical to the one presented here.  *Angelone*, 319 A.2d at 346.  The court explained that an explicit exclusion in an insurance policy "for personal injury or property damage 'which is either expected or intended from the standpoint of the Insured'" is not triggered when "the record shows an intentional act but an unintentional harm"); *see also Employers' Fire*

*Ins. Co. v. Beals*, 240 A.2d 397, 399 (R.I. 1968).[8]  Neither *Grenga* nor *Angelone*

turned on the severity of the underlying offense.   Instead, the exclusion's

applicability depended solely on the insured's intention to cause injury.   If an

insured intended to cause bodily injury, then the insurance company had no duty

to defend or indemnify.   If the insured's intentional acts resulted in an

unintended injury, however, the exclusion from coverage would not apply and the

insurance company would maintain its duties, regardless of the severity of the

incident.  *See Beals*, 240 A.2d at 399 (finding the exclusion did not apply and that

insurance company maintained its duty to defend a child who blinded a

classmate by stabbing his eye with a pencil because the child's intent to injure

was not clearly established).

13.    Based on several factual findings listed above above, the Court holds

that Travelers has not carried its burden to establish that Moore intended bodily

injury and thus the "intended or expected from the standpoint of the insured"

exclusion is not triggered.   The Court found that the vehicles were still in motion

when the gun fired.  (FoF no. 42.)  The barrel was resting on the van's windowsill

---

[8] The Rhode Island Supreme Court later modified the rule in sexual molestation cases.  *Peerless Ins. Co. v. Viegas*, 667 A.2d 785, 788-89 (R.I. 1995).  In *Peerless*, the Rhode Island Supreme Court adopted, in a case of first impression, the inferred intent doctrine for sexual molestation. *Id.*  "We will infer an intent to cause harm and injury in cases involving the sexual molestation of a minor.  In civil actions for damages that result from an act of child sexual molestation, an insurer will be relieved from its duty to defend and to indemnify its insured if the perpetrator is insured under a policy in which there is contained an intentional act exclusion provision."  *Id. Peerless* specifically limited its holding to sexual molestation cases, and thus left intact the intent rules announced in *Grenga* and *Angelone*.  As Plaintiff acknowledges, the modification has not extended to other areas.  (*See* Pl. Br. in Support of Proposed Findings at 20, note 12 ("Rhode Island has not yet determined whether the inferred-intent standard applies in a gun-related case.").)  Therefore, the Court does not apply the inferred intent doctrine here.

at the moment of collision, and thus the barrel likely got stuck or was jostled away from Moore's grasp during the collision.  (FoF no. 34; Trial Tr. (Thackston) 86:11.)  Moreover, the cars were traveling at approximately 25-35 miles per hour just before the collision.  (FoF no. 32.)  At this speed, the truck, significantly heavier than the van as a result of the boom and Mustang, would doubtless alter the van's course and Moore's control of the shotgun upon contact.  (FoF no. 33.)  Finally, the two cars were stuck together after the collision, which makes it more likely that the barrel became wedged between the passenger side mirror and door at the time of the fifth shot.  (FoF no. 48.)  The evidence surrounding the scene, and resulting inferences, suggest that Moore did not intend bodily injury.

Plaintiff, despite having the burden, does not present sufficient countervailing evidence to combat this determination.  Plaintiff proposed that the vehicles collided and came to a complete stop before the shotgun discharged.  Since the gun did not have an accidental discharge problem and instead discharged upon a trigger pull, Moore "must have pulled the trigger of the shotgun to cause it to fire."  (FoF no. 21, 17; Doc. 84, ¶ 29.)  Plaintiff's theory hinges on both vehicles coming to a complete stop before the shot.  The Court finds otherwise, and thus rejects Plaintiff's theory.

Plaintiff also argued that Moore's testimony at the criminal trial resolved the case.  "While Travelers disputes Moore's rendition of the facts, that dispute is irrelevant," Travelers argues.  (Pl. Br. in Supp. of Proposed Findings, Doc. 88, at 16.)  Since Moore testified about a number of intentional and perhaps even

reckless acts, Travelers insists that the Court's inquiry should end there. (Pl. Br. Proposed Findings at 16, Doc. 85, (contending, indisputably, that Moore: chased after Thackston in his van, drove with sawed off shotgun in one hand, noticed Thackston swerving, and nonetheless drove up beside Thackston).)   Travelers contends that "regardless of whether Moore intentionally pulled the trigger, [those] intentional acts caused Thackston's and Thomas's injuries under Rhode Island law." (Pl. Resp. to Defs. Proposed Findings, Doc. 88, at 10.)

As the Court previously explained, however, under Rhode Island law, the intentional act exclusion is not triggered absent a finding that the insured intended the injury that resulted.  Plaintiff erroneously relies on tort law.  If a reasonable foreseeability standard governs, then the Court need not consider the particular sequence that led to the discharge and may properly consider only the probability of harm when driving with a shotgun.  Yet, Rhode Island does not use the reasonable foreseeability test when reading insurance policies.  *See supra* Section IV.B.1.  Consequently, whether Moore intentionally pulled the trigger is not only relevant, but necessary to decide if Thomas's and Thackston's injuries were "expected or intended from the standpoint of the insured."  Travelers, believing that tort's reasonable foreseeability standard disposes of the controversy, failed to meet its burden.

Finally, the Court provided the parties with an additional opportunity to explain how the ballistic evidence bears on the causation of Thomas's death and Thackston injuries and thus how, if at all, it bears on whether Moore intended to

cause injury.  (Doc. 95.)  In response, the parties submitted additional proposed findings and briefs.  (Docs. 96-98.)  These supplemental filings reaffirmed the parties' positions and added nothing more; the Court found no basis to alter its decision that the preponderance of the evidence suggests Moore did not intend injury.

In sum, Plaintiff's theory relied heavily on Thackston's testimony that the vehicles came to a complete stop before the fifth shotgun discharge.  Other testimony, physical evidence, and a medical examiner's report all contradicted Thackston's testimony.  Plaintiff did not address the contrary facts or testimony and did not carry its burden as a result.  The Court concludes that Moore did not intend bodily injury by his actions and thus, the intentional acts exclusion in the policy does not apply.

## V.    CONCLUSION

For the foregoing reasons, the Court **FINDS** that, under Rhode Island law, the November 12, 2009 incident was an "accident" within the meaning of the subject policy and the "expected or intended from standpoint of insured" exclusion in the policy does not apply because the preponderance of the evidence suggests that Moore did not intend to inflict bodily harm by his actions — he intended to reclaim his vehicle.  Plaintiff maintains all contractual obligations consistent with these findings and the terms of the Policy.

As no issues in remain in dispute, the Court **DIRECTS** the Clerk to close the case.

**IT IS SO ORDERED** this 26th day of August, 2013.

**Amy Totenberg**
**United States District Judge**